Filed 1/11/22  P. v. Tran CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PHUC MINH QUYEN TRAN,<br><br>    Defendant and Appellant. | G059232<br><br>(Super. Ct. No. 19WF1734)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Kathleen E. Roberts, Judge.  Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis, and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

In the early morning hours, just minutes after J.E.'s boyfriend left for work, Phuc Minh Quyen Tran entered J.E.'s home, made his way to her room, and climbed into bed with her. Believing it was her boyfriend, J.E. did not resist Tran as he kissed her and digitally penetrated her. Tran fled once J.E. realized it was not her boyfriend in bed with her and she started screaming. Tran left behind his jacket and an iced tea bottle. Although J.E. was unable to identify her attacker, forensic analysis of the jacket and bottle produced a male DNA profile matching Tran's.

A jury convicted Tran of assault with the intent to commit forcible sexual penetration during the commission of a first degree burglary. (Pen. Code, § 220, subd. (b).) [1] In his appeal, Tran contends (1) the evidence was insufficient to prove he intended to commit forcible sexual penetration, (2) the evidence was insufficient to support the jury's finding he entered the house with the intent to commit forcible sexual penetration or any felony, (3) the court misinstructed the jury on an element of burglary, (4) the court erroneously denied his new trial motion, in which he argued testimony concerning the DNA evidence violated his constitutional right to confront witnesses because the witness was a technical reviewer and did not actually perform the DNA testing, and (5) the court should have granted his new trial motion on the ground the prosecutor committed misconduct during closing argument. We find no error and affirm the judgment.

FACTS

I. *Substantive Facts*

A. *Prosecution Evidence*

J.E. lived in a four-bedroom house with her boyfriend (Boyfriend), his father (Father), Boyfriend's sister (Sister), and Boyfriend's nephew. J.E. and Boyfriend slept in one bedroom of the house, while Father and Sister had their own separate bedrooms.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

Boyfriend typically woke up around 3:45 a.m. because he had to be at work by 4:30 or 5:00 a.m. Sometimes J.E. would wake up with him, but most mornings, she stayed in bed sleeping or trying to sleep. Boyfriend had a morning routine he usually followed. After getting dressed and ready to go to work, he would get back into bed with J.E. and lay down for a few minutes. He would cuddle with her and try to get a couple more minutes of sleep. Before leaving, he would caress J.E. and say goodbye.

On Thanksgiving Day 2018, the family celebrated the holiday at home with friends. Father's girlfriend spent the night at the house, as did Sister's boyfriend. The next morning, Boyfriend got up around 3:45 or 4:00 a.m. to get ready for work. While he was getting ready, he did not see anyone else up in the house.

Around 4:30 a.m., Father heard Boyfriend moving about the house. Father went to the kitchen to get some coffee and leftover pumpkin pie. He saw Boyfriend walk back toward J.E.'s bedroom. Father returned to his bedroom with his coffee and pie. Later, he heard the front door close and assumed it was Boyfriend leaving.

J.E. was asleep when someone came into her bedroom. She woke up and saw a figure standing at the corner of her bed. The bedroom light was off. She assumed it was her boyfriend looking for his keys or wallet. She got up to help but laid back down when he just stood there and did not say anything.

J.E., who sleeps naked, laid down on her left side under the covers. Tran got into the bed laying on his right side and facing her. He kissed her "aggressively" by sticking his tongue in her mouth. Beginning at her shoulder, he ran his hand down her body and digitally penetrated her.

When Tran got into the bed, J.E. thought it was Boyfriend. She caressed his face and ran her fingers through his hair as she often did. But the hair and face felt different. J.E. noticed the hair was gelled and combed to the side, unlike the way her boyfriend wore his hair to work. The kiss felt different too.

3

When Tran moved down to orally copulate her, J.E. grabbed his head and asked what he was doing.  As J.E. tried to pull his face toward her, Tran pulled away. When she tried to feel his face to determine if it was her boyfriend, Tran pulled away. She asked, "'Is this you?'" a couple of times but did not receive a response. She then asked, "'Who is this?'" Tran replied, "'I'm your baby daddy.'" Hearing his voice, J.E. knew it was not Boyfriend. Her utterances of "'No, no, no, no'" grew increasingly louder until she was screaming "at the top of [her] lungs."

Tran got out of the bed and was standing next to it. J.E. grabbed him. She had ahold of his jacket and was trying to keep him there long enough for someone in the house to come help her. The two wrestled as Tran tried to get away.  Shedding his jacket, Tran escaped J.E.'s grasp and ran down the hallway. J.E. gave chase. Tran ran out of the house through the open front door and down the street. J.E. stopped at the front door because she was unclothed.

Father and his girlfriend were eating leftovers in his bedroom and watching the news when they heard J.E. screaming and the thumping of feet running down the hallway. J.E.'s screams roused everyone in the house, and they came running out of their bedrooms to see what was wrong. When Sister came out of her room, she saw J.E. running through the living room toward the front door but did not see whom J.E. was chasing. J.E. was in the living room, screaming hysterically when Father saw her. He asked what was wrong, but she did not respond. Sister's boyfriend and Father ran out of the house not knowing who they were looking for, but regardless, they did not see anyone in the dark. J.E. got dressed. Sister called 911 and reported J.E. had been sexually assaulted. J.E. told the dispatcher the man was White or possibly Asian and in his 20's or 30's.  J.E. called Boyfriend, and he returned home.

The police received the call around 5:00 a.m. and arrived within a few minutes.  J.E. described her assailant as being between five and one-half feet to six feet

4

tall, having a regular build, and strong. Police officers canvassed the neighborhood for suspects or witnesses but found neither.

Boyfriend told the responding officers he left for work about 4:35 a.m. that morning, leaving through the kitchen door, and locking it as he left. The front door was closed but he was not sure if it was locked.

The police collected evidence from J.E.'s bedroom, including the jacket from the floor and the bedding. They also collected a bottle of iced tea found on the stairs leading to J.E.'s bedroom, which had not been there when J.E. went to bed the night before or when her boyfriend got up in the morning. The interior and exterior doorknobs to J.E.'s bedroom were swabbed for DNA. Later that morning, a nurse performed a sexual assault examination of J.E. and collected swabs for DNA analysis.

The iced tea bottle, jacket, and swabs taken during J.E.'s sexual assault examination were sent to the Orange County Crime Lab (OCCL) for forensic testing. The iced tea bottle was fingerprinted and swabbed for DNA. A forensic specialist collected one DNA swab from the bottle's exterior and another from the mouth of the bottle and interior of the bottle's cap. The two swabs from the bottle were analyzed, and the DNA profile from the mouth of the bottle matched Tran's DNA profile.

The jacket's interior collar was also swabbed for DNA. Forensic analysis found a DNA mixture that had two main contributors—J.E. and Tran. There was also low level or trace DNA, possibly from two contributors but it was at a level the lab found inconclusive.

In February 2019, Detective Daniel Flynn was informed of a match in a DNA database between Tran's DNA profile and the DNA profile obtained from the items of evidence. Flynn contacted J.E. and Boyfriend to see if they knew Tran but neither did. J.E. was shown a photographic lineup that included Tran's photo, but she was unable to identify anyone.

During their investigation, the police learned Tran worked at a construction site near J.E.'s house. Tran's physical appearance was generally consistent with J.E.'s description of her attacker as Tran wore his hair in the same fashion and he was five feet, six inches tall and weighed 135 pounds. A police sergeant arrested Tran outside his residence in July 2019.

B. *Defense Evidence*

Tran testified in his own defense and denied committing the offense. He did not know J.E. but lived near her home and often worked at a nearby construction site. He did not have a car so he would walk to work or get a ride from coworkers. To get to work, he usually left his house around 7:15 a.m.; he never left before 5:00 a.m.

Tran admitted the jacket recovered from J.E.'s bedroom was his. He had lost this jacket at the construction site a few weeks before J.E. was attacked. Tran had worn the jacket to work and taken it off when he got hot. He left the jacket at the work site that evening, and when he returned the next day, it was gone. As for the iced tea bottle, it could have also come from the construction site. Tran drank lots of fluids while at work, including iced tea. He had forgotten food and beverage containers at work, and they were gone the next day.

Corporal Jeremy Fletcher responded to the 911 call at J.E.'s house and canvassed the neighborhood for possible suspects. J.E. suspected her assailant might have been a young Asian male who lived in the neighborhood (not Tran). Fletcher and two other officers attempted to contact this individual at his home, but no one answered when they knocked. Fletcher did not make any further efforts to locate this suspect. However, Fletcher did locate a surveillance camera at a house down the street from J.E.'s, and he viewed the footage from that morning. The video did not capture anyone walking by but showed one vehicle driving past.

6

II. *Procedural Facts*

A jury convicted Tran of the single charge of assault with the intent to commit a violation of section 289 (sexual penetration) during the commission of a first degree burglary. (§ 220, subd. (b).) Tran subsequently filed two motions for a new trial, and the trial court denied both.[2] The court sentenced Tran to prison for life with parole eligibility after a minimum of seven years.

## DISCUSSION

I. *Sufficiency of the Evidence Claims*

Tran contends the evidence was insufficient to support his conviction for assault with the intent to commit forcible sexual penetration in the commission of first degree burglary. Specifically, he asserts the evidence was insufficient to support the jury's findings he (1) intended to commit forcible sexual penetration, and (2) entered the residence with the intent to commit forcible sexual penetration or any felony. We disagree.

A. *Applicable Law*

1. *Standard for Evaluating the Sufficiency of the Evidence*

"In evaluating whether the judgment is supported by substantial evidence, we review the entire record in the light most favorable to the judgment, presume in support of the judgment every fact that can reasonably be deduced from the evidence in the record and determine whether any reasonable finder of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citation.] We do not reweigh conflicting evidence or reevaluate the credibility of witnesses. [Citation.]" (*People v. Skiff* (2021) 59 Cal.App.5th 571, 579.) This standard of review also "applies to cases in which the prosecution relies mainly on circumstantial evidence [citation] . . . . An appellate court must accept logical inferences that the jury might have drawn from the

_____

[2] Because Tran challenges the court's denial of his two new trial motions, we discuss them in more detail *post*.

7

circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396 (*Maury*).)

"'""""If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."'" [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

2. *Assault with the Intent to Commit Forcible Sexual Penetration During the Commission of First Degree Burglary*

Section 220, subdivision (b), states, "Any person who, in the commission of a burglary of the first degree, as defined in subdivision (a) of Section 460, assaults another with intent to commit rape, sodomy, oral copulation, or any violation of Section 264.1, 288, or 289 shall be punished . . . ." In the information, the prosecution alleged Tran violated section 220, subdivision (b), by committing an assault with the intent to commit sexual penetration in violation of section 289 during the commission of a first degree burglary. One of the ways section 289 is violated is by accomplishing "an act of sexual penetration . . . against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim . . . ." (§ 289, subd. (a)(1)(A).) Here, the jury was instructed on the theory of assault with the intent to commit sexual penetration by force, fear, or threats.

The offense of assault with the intent to commit sexual penetration by force does not require the application of any force. The offense can be committed before any force has been applied and without the use of threats or fear. (*People v. Cook* (2017) 8 Cal.App.5th 309, 311.) The reason is "[a]n assault is an unlawful *attempt*, coupled with a present *ability*, to inflict a violent injury on a person . . . [and] does not require contact with the victim." (*Id.* at p. 313.) An assault with the intent to commit sexual penetration

8

by force has the added element of "the perpetrator's subjective intent, during the commission of the assault," to commit a sexual penetration by force. (*Ibid.*)

Here, the court instructed the jury on the offense as follows: "The defendant is charged in Count 1 with assault with intent to commit sexual penetration while committing first degree burglary in violation of . . . section 220(b). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant did an act that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] 4. When the defendant acted, he had the present ability to apply force to a person; [¶] AND [¶] 5. When the defendant acted, he intended to commit sexual penetration[;] [¶] AND [¶] 6. When the defendant acted, he was committing a first degree burglary." (CALCRIM No. 890.) The instruction advised the jury to refer to the instruction on sexual penetration (CALCRIM No. 1045) "[t]o decide whether defendant intended to commit sexual penetration" and explained first degree burglary was defined in separate instructions (CALCRIM Nos. 1700 & 1701).

3. *Proof of Intent*

Tran's contentions of insufficient evidence focus on the offense's intent elements within the assault and first degree burglary components. Our Supreme Court has explained: "'"The essential element of [assault with intent to commit [a sexual act]] is the intent to commit the act against the will of the complainant. The offense is complete if at any moment during the assault the accused intends to use whatever force may be required."' [Citation.] '"[I]f there is evidence of the former intent and acts attendant to the execution of that intent, the abandonment of that intent before consummation of the act will not erase the felonious nature of the assault."' [Citation.]" (*Maury, supra*, 30 Cal.4th at pp. 399-400.)

9

A conviction for assault with the intent to commit a sexual act requires proof of an assault and that the defendant had the intent "'to use whatever force [was] required to complete the sexual act against the will of the victim.' [Citation.]" (*People v. Bradley* (1993) 15 Cal.App.4th 1144, 1154, disapproved on other grounds in *People v. Rayford* (1994) 9 Cal.4th 1, 21.) "'It is the state of mind of the defendant . . . which is in issue.' [Citations.] . . . 'The question whether the intent existed is one for the jury to determine from the conduct of the defendant and the surrounding circumstances.' [Citations.]" (*People v. Bradley, supra*, 15 Cal.App.4th at p. 1154.) "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense. [Citations.]" (*People v. Pre* (2004) 117 Cal.App.4th 413, 420; accord, *People v. Davis* (2009) 46 Cal.4th 539, 606 (*Davis*) ["'[s]pecific intent may be, and usually must be, inferred from circumstantial evidence'"].)

B.  *Sufficient Evidence of Intent to Commit Forcible Sexual Penetration*

With these principles in mind, we consider Tran's contention the evidence was insufficient to prove he intended to commit forcible sexual penetration because there was no evidence he used force to overcome J.E.'s will. We conclude the jury could draw a reasonable inference from the circumstances under which the offense was committed that Tran intended to use whatever force was necessary to complete the act of sexual penetration against J.E.'s will.

The most notable circumstances are that Tran, a stranger, entered J.E.'s bedroom in the dark of the early morning, got into bed with her, "aggressively" kissed her, ran his hand over her body, and digitally penetrated her. He then attempted to orally copulate J.E. but was unable to when she realized he was a stranger. Based on Tran's conduct and the surrounding circumstances, the jury could reasonably conclude he assaulted J.E. with the intent to commit forcible sexual penetration.  Indeed, the evidence showed he not only intended to commit forcible sexual penetration but actually did so.

10

We will not substitute our judgment for the jury's when the verdict is supported by substantial evidence.

In arguing the evidence was insufficient to support the jury's intent finding, Tran focuses on his actions of leaving as soon as J.E. "expressed resistance." He asserts this shows he did not intend to forcibly penetrate her. But Tran's flight came after he had already assaulted J.E., completed the act of sexual penetration against her will, and was attempting to commit oral copulation. Tran's subsequent actions did not erase the assault or negate his intent. (*Maury, supra*, 30 Cal.4th at p. 400 [abandonment of intent before consummation of sexual act does not erase the assault].) The facts demonstrated Tran intended to use whatever force was necessary to complete the sexual penetration against J.E.'s will because he had already done so. That Tran stopped and fled before committing another sexual act does not change the evidence demonstrating his intent to commit forcible sexual penetration. Nor does it render the jury's verdict unsupported.

Tran contrasts his case with the situation in *Bradley, supra*, 15 Cal.App.4th 1144. But *Bradley* does not compel a different result. There, defendant contended the evidence was insufficient to prove his intent to commit rape, an element of his convictions for kidnapping with the intent to commit rape and assault with the intent to commit rape. (*Id.* at p. 1149.) Rejecting this contention, the Court of Appeal held, "There was ample objective evidence supporting the jury's finding Bradley intended to complete a sexual act during his encounter with [the victim], employing the force required to overcome her will, and, thus, had the requisite specific intent to commit rape." (*Id.* at p. 1155.)

In *Bradley*, the Court of Appeal reiterated the "specific intent element is sufficiently met when the defendant sets out to 'use whatever force is required to complete the sexual act against the will of the victim.' [Citation.]" (*Bradley, supra*, 15 Cal.App.4th at p. 1154.) The *Bradley* court explained the jury could look at the victim's characteristics (age, maturity, experience) when determining "what amount of

force [was] sufficient to overcome the victim's will to resist" and noted a victim is not "required to resist violently, or with all possible resistance. [Citations.]" (*Id.* at p. 1155.) Based on the facts before it, the Court of Appeal concluded there was sufficient evidence the force defendant used was the amount required to overcome the victim's will. There, the evidence showed defendant grabbed the 16-year-old victim's arm, who was unable to scream or resist due to fright, and led her to a nearby dumpster enclosure area while tightly holding her arm. (*Ibid.*) Additional evidence defendant kissed the victim's neck, fondled her breasts, placed his hand in her shorts, and pressed his erection against her supported the jury's finding he intended to complete a sexual act against the victim. (*Ibid.*)

Tran contends his case "stands in stark contrast" to *Bradley* because in his case there is an "absence of circumstances to draw an inference of assault with intent to commit penetration by force." He asserts the evidence shows "the person kissed [J.E.] and penetrated her without resistance, and when she realized the person was not [Boyfriend], it was she who grabbed him, not the other way around, and it was he who escaped her grasp and immediately fled." At its core, Tran's argument is J.E. did not resist his act of sexual penetration, and therefore, there is no evidence he intended to use force to overcome her will had she resisted. To say we disagree is putting it mildly.

Tran's assertion the evidence was insufficient ignores the circumstances surrounding the offense and the principle *Bradley* emphasizes—the determination of what amount of force was required to overcome the victim's will takes into account the amount of the victim's resistance. (*Bradley, supra*, 15 Cal.App.4th at p. 1155.) Let us be clear. J.E. was under no obligation to resist. When a defendant is charged with assault with the intent to commit forcible sexual penetration, the prosecution does not have to prove the victim resisted. (Cf. *People v. Barnes* (1986) 42 Cal.3d 284 [amendment to § 261 in 1980 removed requirement prosecuting witness must resist or be prevented from doing so by threats].) Considering the circumstances under which Tran committed his

12

offense, J.E.'s lack of initial resistance is understandable. J.E. was asleep in her bedroom, a space where she only expected her boyfriend to enter in the early morning hours. Instead, Tran, a complete stranger, entered her bedroom, got into bed with her, and began kissing and touching her. J.E. did not initially resist because she believed it was her boyfriend. The force Tran used to sexually penetrate J.E. was the amount required to overcome her will to resist. Tran's abandonment of his efforts to commit additional sexual acts when J.E. realized he was not her boyfriend and resisted his efforts did not erase his intent to commit the completed forcible sexual penetration. Thus, we conclude the jury's finding Tran intended to commit forcible sexual penetration is supported by substantial evidence.

C. *Sufficient Evidence of Burglary*

Tran also challenges the sufficiency of the evidence supporting the intent element of the first degree burglary component of the offense. He asserts the evidence was insufficient to prove he entered the residence with the intent to commit any felony. We disagree.

Concerning the first degree burglary component, the court instructed the jury the prosecution had to prove "[w]hen [Tran] entered a building, he intended to commit Sexual Penetration." (CALCRIM No. 1700.) As mentioned *ante*, "'[s]pecific intent may be, and usually must be, inferred from circumstantial evidence.' [Citation.]" (*Davis, supra*, 46 Cal.4th at p. 606.) Tran contends "there was no circumstantial evidence from which it could be inferred that . . . he entered the residence with the intent to commit the felony offense of sexual penetration by force, and without such intent there was no burglary." For the most part, this contention is a rephrasing of his first argument there was no evidence of an intent to commit forcible sexual penetration because J.E. did not initially resist him. As we have already discussed, there was substantial evidence Tran intended to commit forcible sexual penetration. Moreover, evidence of his conduct upon entering J.E.'s home supports a reasonable inference he intended to commit forcible

13

sexual penetration when he entered the residence. (*People v. Holt* (1997) 15 Cal.4th 619, 669-670 [explaining when defendant challenged the sufficiency of the evidence proving his intent when he entered the residence, the question "is whether the evidence, including that of defendant's conduct during and after his entry, supports a reasonable inference that the intent to commit [a felony] existed at the time he entered the home"].)

The evidence indicates Tran entered the home and made his way to J.E.'s bedroom, where he sexually assaulted her. He did not go into the other bedrooms and nothing was reported stolen or appeared out of order, other than the items Tran left behind.

Movements of the house's occupants reveal Tran did not linger about the house but instead quickly went to J.E.'s room. The trial evidence indicated Boyfriend left the house about 4:35 a.m. Around this time, Father and his girlfriend got up, went to the kitchen for leftovers, and then returned to Father's bedroom. Although unsure of the time, Father believed he had been back in his bedroom for only five or ten minutes when he heard J.E. screaming.

Tran's conduct once he entered J.E.'s bedroom also reveals his intent. He did not attempt to take items from the room and leave while she slept. Instead, he climbed into bed with her and began sexually assaulting her. Accordingly, we conclude the evidence was sufficient to support the jury's finding Tran entered the residence with the intent to commit forcible sexual penetration.

II. *Instructional Error Claim*

The trial court instructed the jury with CALCRIM No. 890 on the charged offense of assault with the intent to commit sexual penetration during the commission of first degree burglary. This instruction explained to the jurors one of the elements they had to find was "[w]hen the defendant acted, he was committing a first degree burglary." The instruction referred the jurors to a separate instruction defining first degree burglary. First degree burglary was actually defined in two instructions. CALCRIM No. 1700

14

stated the elements of burglary, and CALCRIM No. 1701 defined first and second degree burglary. Tran's claim of instructional error concerns the intent element of the burglary instruction, CALCRIM No. 1700.

As given, CALCRIM No. 1700 repeated that Tran was charged with assault with the intent to commit sexual penetration during the commission of first degree burglary. The instruction stated: "To prove that the defendant was in the commission of a First Degree Burglary, the People must prove that: [¶] 1. The defendant entered a building; [¶] AND [¶] 2. When he entered a building, he intended to commit Sexual Penetration. [¶] To decide whether the defendant intended to commit Sexual Penetration by force, please refer to the separate instructions that I will give you on that crime. [¶] A burglary was committed if the defendant entered with the intent to commit Sexual Penetration. The defendant does not need to have actually committed Sexual Penetration as long as he entered with the intent to do so. The People do not have to prove that the defendant actually committed Sexual Penetration."

The court instructed the jury on the elements of forcible sexual penetration by giving CALCRIM No. 1045. Tran does not assert the jury was misinstructed on the elements of the offense of forcible sexual penetration.

Focusing on the burglary instruction (CALCRIM No. 1700), Tran asserts for the first time on appeal the court failed to properly instruct the jury on the intent element of burglary. Tran contends the burglary instruction "was insufficient because it did not apprise the jury that it was necessary [to] find that the person entered the building with the intent to commit any felony, because 'sexual penetration' itself is not a felony." We disagree. The instructions, read as whole, properly instructed the jury on the elements of burglary, which in turn was a component of the assault charge.

A. *Forfeiture*

Preliminary, we address the Attorney General's contention Tran forfeited his instructional error claim by failing to request modification of the burglary instruction

15

in the trial court. Generally, "'[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language[ ]'" in the trial court. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901.) Responding to the Attorney General's forfeiture argument, Tran asserts forfeiture does not apply despite his failure to request modification of the instruction below because the court had a sua sponte duty to correctly instruct on all of the elements of first degree burglary. Tran also contends misinstruction on the intent element of burglary deprived him of his rights to due process and a fair trial. The "failure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are affected." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).) To determine whether Tran forfeited his claim of instructional error, we must ascertain whether his substantial rights were affected. Thus, we proceed to the merits of Tran's claim.

B. *Applicable Law*

"The trial court has a sua sponte duty to instruct the jury on all essential elements of a charged offense. [Citation.] . . . [Citation.] All criminal defendants have the right to 'a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' [Citations.]" (*People v. Merritt* (2017) 2 Cal.5th 819, 824.)

"An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*Mitchell, supra*, 7 Cal.5th at p. 579.)

16

C. *There was no Instructional Error*

Tran contends the court misinstructed the jury on the intent element of burglary because the instruction stated the jury had to find "'[w]hen he entered a building, he intended to commit Sexual Penetration.'" Tran asserts "'[s]exual penetration' itself is not a felony," and therefore, the instruction "allowed the jury to find [him] guilty of burglary without the intent to commit a felony." He acknowledges jury instructions are to be viewed as a whole and the jury was separately and correctly instructed on the elements of forcible sexual penetration. But he argues the separate instruction on forcible sexual penetration was insufficient to inform the jury it must find he intended to commit sexual penetration by force when he entered the building. He further argues, "The fact that the CALCRIM [No.] 1700 instruction referred one time to 'sexual penetration by force' and three times to 'sexual penetration' suggested that the two were not necessarily the same." Tran's argument is not persuasive.

It is not reasonably likely the jury was confused or misunderstood the law. The burglary instruction directed the jurors to refer to the instruction on forcible sexual penetration "[t]o decide whether the defendant intended to commit Sexual Penetration by force" and the jury was properly instructed on the elements of forcible sexual penetration. We presume the jurors followed the direction in the burglary instruction to refer to the instruction on sexual penetration by force. (*People v. Avila* (2006) 38 Cal.4th 491, 574.)

Tran's argument, essentially, is the target offense in the burglary instruction should have been described as sexual penetration by force rather than sexual penetration. The court's use of an abbreviated title in the burglary instruction for the sexual penetration by force instruction does not mean the jury was misinstructed on the elements of burglary. Referring to the target offense in part of the burglary instruction as sexual penetration rather than sexual penetration by force did not create a misleading or confusing instruction. The jury was given one instruction on sexual penetration, CALCRIM No. 1045, which defined the elements of sexual penetration by force, fear, or

17

threats. Thus, any doubt or confusion as to whether Tran had to intend to commit a sexual penetration or forcible sexual penetration was remedied by the instruction on sexual penetration by force, fear, or threats. Viewing the instructions as a whole, as we must, it is not reasonably likely the jury applied the instructions in an impermissible manner. Thus, there was no instructional error.

## III. *Denial of New Trial Motions*

Tran contends the trial court erred by denying his two motions for a new trial. In one new trial motion, Tran argued testimony by Aimee Yap, a technical reviewer from the OCCL, concerning the DNA results and conclusions drawn by other analysts violated his Sixth Amendment right to confrontation. Tran asserted in his other new trial motion he was entitled to a new trial under section 1181, subdivision (5), because the prosecutor committed prejudicial misconduct during her rebuttal argument.

"'""""We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." [Citations.] "'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.'"""' [Citation.]" (*People v. Hoyt* (2020) 8 Cal.5th 892, 957.) Here, we conclude the court did not abuse its discretion by denying Tran's new trial motions.

## A. *Tran's Confrontation Clause Claim*

In one motion, Tran asserted his constitutional rights to due process and confrontation had been violated by the admission of Yap's testimony concerning the DNA evidence. His motion relied on a decision from this court that was not certified for publication until after the hearing on his motion—*People v. Ogaz* (2020) 53 Cal.App.5th 280 (*Ogaz*). Denying the motion, the trial court concluded no error occurred because "all of these things [Yap] testified to were the purview of her opinion" and she was not "merely a conduit to get some results in" evidence. We agree.

18

Tran's case is readily distinguishable from the situation in *Ogaz, supra*, 53 Cal.App.5th 280. There, this court concluded "the trial court erred in admitting evidence regarding the OCCL's drug testing results, absent testimony from the person who actually conducted the testing" and the error violated defendant's Sixth Amendment right to confrontation. (*Id.* at p. 284.) However, this court explained there would have been no error if the testifying witness "had formulated his own independent opinions based on the data [the analyst] produced during the testing process." (*Id.* at p. 293.) That is what happened here. Yap testified she personally compared the mixture DNA profile from the jacket to Tran's DNA profile, and in her opinion, Tran was a main contributor to the mixture sample. Yap testified she personally looked at the profiles to see if either J.E. or Tran could be contributors for or the source of the DNA detected on the iced tea bottle. She determined there was one contributor from the swab taken of the mouthpiece and interior cap of the bottle. Yap indicated she personally compared the DNA profile obtained from the bottle cap's interior and mouthpiece to the known samples. When the prosecutor asked whether there was a match, Yap responded, "The profile from the bottle mouth area was the same as the profile obtained from Tran's DNA sample." Yap's testimony did not violate Tran's Sixth Amendment right to confrontation, and therefore, the court did not abuse its discretion by denying Tran's new trial motion.

We further conclude the trial court did not abuse its discretion by denying Tran's new trial motion on this ground because Tran did not object to the admission of Yap's testimony, prior to or during the trial, on the ground it violated his right to confrontation or was inadmissible hearsay under *Crawford v. Washington* (2004) 541 U.S. 36 or *People v. Sanchez* (2016) 63 Cal.4th 665. Tran's failure to raise a Sixth Amendment objection until after the trial provided an additional, independent basis for denying his new trial motion.

Before trial, the prosecution filed an in limine motion to admit evidence of the DNA analysis through the testimony of the forensic scientist case manager or

19

technical reviewer. The motion explained that at the OCCL, "evidentiary items are analyzed for DNA using batch processing" and each step of this process may be performed by a different analyst. But at the final stage, the case manager, relying on his or her own work and the work of other scientists in the lab, forms an opinion as to whether the DNA matches a particular person or suspect. The prosecution argued admission of the DNA evidence through the testimony of the case manager did not violate the Sixth Amendment because the DNA test results were not testimonial as the analysts' reports did not contain the necessary degree of formality and they were not prepared with the primary purpose of targeting an individual.

At the hearing on the prosecution's motion, Tran's counsel did not object to the admission of the DNA evidence through the testimony of a forensic case manager or technical reviewer. The court ruled the prosecution could admit evidence of the DNA analysis through the case manager or supervising forensic scientist if the prosecution could lay a sufficient foundation. Defense counsel made no Sixth Amendment, *Crawford*, or *Sanchez* objection during Yap's testimony. Raising the confrontation issue in the new trial motion was too late. (Evid. Code, § 353, subd. (a) [a verdict shall not be set aside unless an objection was timely made and the specific ground clearly stated].)

B. *Tran's Prosecutorial Misconduct Claim*

In his other new trial motion, Tran contended the prosecutor committed misconduct during her rebuttal argument by misleading the jury regarding the state of the DNA and identification evidence and by accusing defense counsel of fabricating a defense. Denying the motion, the court found the prosecutor's "closing argument was appropriate" and there was no prosecutorial misconduct. Again, we agree with the trial court.

"A prosecutor's misconduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be

20

'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.]  A prosecutor's misconduct 'that does not render a criminal trial fundamentally unfair' violates California law 'only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"' [Citations.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 242.)

"In evaluating a claim of prejudicial misconduct based upon a prosecutor's comments to the jury, we decide whether there is a reasonable possibility that the jury construed or applied the prosecutor's comments in an objectionable manner. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1019.) A judgment of conviction will be reversed based on prosecutorial misconduct "only when, after reviewing the totality of the evidence, we can determine it is reasonably probable that a result more favorable to defendant would have occurred absent the misconduct. [Citations.]" (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386.)

1. *Misstatement of the Evidence*

In his new trial motion, Tran's contention of prosecutorial misconduct focused on multiple statements the prosecutor made during her rebuttal argument referring to Tran's DNA as the "only" DNA found at the scene.

To provide context, we quote the prosecutor's argument at length and italicize the complained-of statements. The prosecutor argued: "The DNA evidence in this case is significant. I talked about it in my first argument with regard to there only being two main contributors on the collar of the jacket. Two. And that there being one sole contributor to the interior mouthpiece of the bottle and the cap. One. In this case we don't have to rely on eyewitness identification. We don't have to rely on [J.E.'s] description. We don't have to rely on grainy surveillance video.  DNA is the silent witness to the truth.

"These crimes happened the way they are committed; in the middle of the night, with no witnesses, avoiding detection, and running when you think you're caught.

21

That's how these crimes occur. *But his DNA is the only DNA at the scene, and he can't run from that*." (Italics added.)

Defense counsel objected the prosecutor misstated the evidence. The court did not rule on the objection but admonished the jurors it was up to them to determine what the evidence showed. The court also reminded the jurors: "What counsel says during argument is just that, argument. So it's up to you to think back what the evidence was and determine what the facts are and make up your own mind."

The prosecutor resumed her argument, stating: "I'm not ignoring the fact that there is trace DNA on these items. That was talked about a lot this morning. But what wasn't talked about with regard to trace DNA is how unreliable it is and how the crime lab can't interpret anything from it. *Defense wants to hang their hat on there's trace DNA, that must be the person who committed this crime. It's trace DNA. There's no evidence to support that.*

"*But we have more than DNA in this case. His hairstyle matched the description from [J.E.], his accent and his tone match the description, his height matched the description. He lived in that close of a proximity to her, and he ran in the direction where he lived. Ladies and Gentlemen, I wouldn't argue . . . to you that each of these on their own is proof beyond a reasonable doubt. It's the fact that all of these things are happening at once in conjunction with the DNA.*

"[¶] . . . [¶]

"*For you to buy into what the defense is arguing to you, you would have to believe that Mr. Tran is the most unlucky person in all of Orange County. You would have to believe, based on the evidence, that it's reasonable that someone took his jacket two months before the crime occurred and never got their DNA on it; that someone found his iced tea bottle -- not necessarily by the jacket. It could have been at a trash pile in Garden Grove. But found his iced tea bottle, never took a drink from it, never got their DNA from it, just carried it around.*

"And you would have to believe that that person decided to bring those two items -- those two items of the defendant's into [J.E.'s] home at the time that he sexually assaulted her. You would have to believe that it's reasonable that he was wearing the defendant's jacket without getting any of his own DNA on it while simultaneously [J.E.], in removing the defendant's jacket, pulling it off of him in a matter of seconds, and then her being disgusted by it. Just that slight of touching, she is a main contributor to the DNA. Main.

"[*Defense counsel*] *said it's possible for someone to touch an item and not get DNA on it. Of course, that's possible. Look at it in the light of this case. This person was wearing the jacket, meanwhile* [*J.E.*] *who touches it for less than a few seconds, in pulling it off, she's a main contributor, and he gets nothing on it.*

"Meanwhile, the bottle of iced tea, he just decided to carry that thing in there and dropping it on the ground without ever taking a drink from it. Then you would have to believe that this same person who -- like defense has said, our DNA is everywhere. It gets everywhere. This person's doesn't, right? *Because the true perpetrator's DNA isn't anywhere at the scene; only the defendant's*." (Italics added.)

Defense counsel again objected the prosecutor was misstating the testimony. The court again advised the jurors to decide for themselves what the evidence showed.

"*This same person who's had the defendant's jacket for two and* [*one-*]*half months and happened to find the defendant's bottle with his DNA and not drink from it and not get his own DNA on it broke into* [*J.E.'s*] *house sexually assaulted her happens to have the same hairstyle as him, happens to speak in a similar accent or tone as him, happens to be the same height as him, happens to run in the direction of his house which is .2 miles away*.

"It's all of those things, ladies and gentlemen, taken into consideration, not just one thing. It's all of that happening at once. That is unreasonable. That would make

23

Mr. Tran the unluckiest person in all of Orange County. It's not reasonable when you look at all of the evidence.

"[¶] . . . [¶]

". . . And when you put it all together, is it reasonable or are we here -- *are we here* [*sic*] *that he's the most unlucky person in all of Orange County? Because that's the only interpretation, other than the fact that he's guilty. And that is not reasonable.*

"The only reasonable conclusion is that he's guilty. *He wasn't acting like* [*a*] *completely innocent person after the crime. He was acting like someone who thought he got away with it. And here he is* I'm asking that you hold him accountable based on the evidence and find him guilty. . . ." (Italics added.)

The law is well established. "'Although it is misconduct to misstate facts, the prosecutor "enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom."' [Citation.]" (*People v. Powell* (2018) 6 Cal.5th 136, 183-184.) Here, the prosecutor's comments were well within the latitude given in closing argument and were fair comments based on the defense evidence and argument. The prosecutor's argument urged the jury to focus on the relevant evidence, and the prosecutor permissibly argued to the jury the reasons why she believed the defense's argument should be rejected. We discern no prosecutorial error in the prosecutor's rebuttal argument. Moreover, both times defense counsel objected, the trial court admonished the jurors they were the exclusive judges of the evidence. We assume the jury adhered to the court's admonition and any prejudice was therefore avoided. (*People v. Bennett* (2009) 45 Cal.4th 577, 614.)

2. *Disparaging Defense Counsel*

In his new trial motion, Tran also asserted the prosecutor impermissibly accused defense counsel of fabricating a defense by arguing during her rebuttal argument, "'For you to buy into what the defense is arguing to you, you would have to believe that

24

Mr. Tran is the most unlucky person in all of Orange County.'" Again, we discern no prosecutorial misconduct.

It is prosecutorial misconduct for the prosecutor to disparage defense counsel in front of the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1193 [accusing defense counsel of lying to jury].) However, our Supreme Court has found no impropriety in egregious prosecutorial remarks aimed solely at the persuasive force of defense counsel's closing argument. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1155, [cataloguing cases and prosecutor's remarks], overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Here, the prosecutor did not accuse defense counsel of fabricating a defense or deceiving the jury. The prosecutor was simply arguing the defense should be rejected based on the evidence.

Because it was not reasonably likely the jury construed the prosecutor's comments in an objectionable manner, the trial court properly denied Tran's new trial motion.

### DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.

25